78 F.3d 1355
 77 A.F.T.R.2d 96-1242, 96-1 USTC P 50,128,
96 Cal. Daily Op. Serv. 1537,
96 Daily Journal D.A.R. 2588
 CONDOR INTERNATIONAL, INC., n.k.a. Applied Resources, Inc.,
Petitioner-Appellant,
v.
COMMISSIONER INTERNAL REVENUE SERVICE, Respondent-Appellee.
CONDOR INTERNATIONAL, INC., n.k.a. Applied Resources, Inc.;
James E. Welsh; Nancy S. Welsh,
Petitioners-Appellants/Cross-Appellees,
v.
COMMISSIONER INTERNAL REVENUE SERVICE,
Respondent-Appellee/Cross-Appellant.
 Nos. 93-70513, 93-70526.
 United States Court of Appeals,
Ninth Circuit.
 Oct. 17, 1995.
Decided March 6, 1996.
 
 Avram Salkin and James V. Looby, Hochman, Salkin and DeRoy, Beverly Hills, California, for petitioners-appellants-cross-appellees.
 Steven W. Parks and Gary R. Allen, Tax Division, United States Department of Justice, Washington, D.C., for respondent-appellee-cross-appellant.
 Appeal from a Decision of the United States Tax Court.
 Before: HUG, ALARCON, and LEAVY, Circuit Judges.
 LEAVY, Circuit Judge:
 
 
 1
 In this case we are called upon to review a decision of the United States Tax Court ("Tax Court") upholding the government's assessment of various taxes and penalties against a husband, his wife, and their Delaware holding company formerly operating in the United States Virgin Islands ("USVI"). For the reasons which follow, we affirm the imposition of capital gains taxes against the husband and wife and the Delaware company, but reverse the assessed deficiencies.
 
 FACTS AND PRIOR PROCEEDINGS
 
 2
 In 1958, James E. Welsh ("Welsh") founded Arlon Products, Inc. ("Arlon"), a California manufacturer of items using pressure-sensitive adhesives. Welsh's intent in creating Arlon was to build a company that could eventually be sold at a profit. By the early 1980s, Arlon had grown to be a multi-million dollar entity. At that time, Welsh and his wife, Nancy (jointly, the "Welshes"), still retained a controlling interest in the company, owning some 75% to 80% of Arlon's outstanding stock.[1] They held these shares as trustees of the Welsh Family Trust, a grantor trust in which the Welshes were the sole grantors, trustees, and beneficiaries.
 
 
 3
 By 1981, the Welshes had decided to sell Arlon, but were concerned about the resultant federal capital gains taxes. After consultation with their lawyer, the Welshes decided to take advantage of the so-called "inhabitant rule" then available to corporations operating in the USVI under the latter's "mirror" system of taxation. Briefly put, that system allowed persons, including corporations, domiciled in the USVI to file a single income tax return with the USVI's Bureau of Internal Revenue ("BIR") and pay (in theory, at least) both their USVI and federal tax obligations directly to the BIR without having to report to the IRS any income derived from sources outside of the USVI.
 
 
 4
 In August 1981, the Welshes established Condor International, Inc. ("Condor"),[2] a Delaware investment company, and designated the USVI as Condor's principal place of business. Although Condor did not engage in any trade or business, rent any office space, or own any equipment in the USVI, it had a USVI mailing address and its sole director, Hortense Rowe ("Rowe"), was a USVI resident who operated an accounting and business advisory service in the USVI.[3]
 
 
 5
 Condor remained inactive until June 1983, when the Welshes located a buyer for their Arlon stock, viz., the Keene Corporation ("Keene"). Rowe then opened a checking account in Condor's name at the USVI branch of a Puerto Rican bank, and two discretionary accounts were opened in the company's name at a Glendale, California, investment firm. The Welshes and the other Arlon shareholders executed a transfer of their Arlon stock to Condor in exchange for all of Condor's outstanding shares, and entered into a separate stock purchase agreement with Keene. The gist of their agreement was that Keene would acquire the Welshes' Arlon stock for a $75,000 promissory note and $3.3 million in cash, to be paid at closing.
 
 
 6
 Upon receipt of Keene's $75,000 note, Rowe executed a stock assignment on behalf of Condor. The Welshes approved the transfer of their stock to Keene, and assigned to Condor their right to receive the $3.3 million cash payment from Keene. The following week (i.e., July 13, 1983), Keene wired $3.3 million to Condor's USVI bank account and received from Rowe a new stock certificate representing all outstanding shares of Arlon stock. Apparently unable to find suitable investments in the USVI, Rowe wired $3.28 million from Condor's USVI bank account to a New York account managed by the Glendale, California, investment firm, and used the remaining $20,000 in its USVI bank account to purchase a USVI certificate of deposit.
 
 
 7
 In its 1983 corporate income tax return filed with the BIR on August 14, 1984, Condor reported income from USVI sources of $1,152 (i.e., the interest on the USVI certificate of deposit), and non-USVI income from sources within the United States of some $4.5 million, including the $3.28 million cash transfer and subsequent investment interest. Condor claimed exemption from all tax thereon, and filed no return with the IRS. In their 1983 joint personal federal income tax return, filed with the IRS on October 17, 1984, the Welshes reported no gain from the sale of their Arlon stock.
 
 
 8
 Two years later, the Welshes' tax plan began to unravel. First came the passage of the Tax Reform Act of 1986 ("TRA"), Pub.L.No. 99-514, 100 Stat. 2085 (Oct. 22, 1986) (codified as amended throughout scattered sections of Titles 16, 19, 26, 42, 46 & 49 of the United States Code), which abolished the USVI's mirror system of taxation by repealing the inhabitant rule that had been in place since 1954. A few months later, the Welshes discovered that Rowe had been embezzling Condor funds; they fired her and moved Condor's principal place of business to California. Finally, the IRS mailed notices of deficiency with additions to tax to Condor and the Welshes in September and October 1987, respectively.
 
 
 9
 Condor and the Welshes separately petitioned the Tax Court for a redetermination of their assessed deficiencies and additions to tax. The Tax Court consolidated the two proceedings and, following a trial on the merits, ruled in favor of the IRS in both cases. Condor Int'l, Inc. v. C.I.R., 98 T.C. 203, 1992 WL 33741 (1992). Condor and the Welshes have timely appealed from that decision, and the IRS has filed a protective cross-appeal.
 
 ANALYSIS
 Standard of Review
 
 10
 We review decisions of the Tax Court on the same basis as we would any decision rendered by a district court in a civil bench trial. Kelley v. C.I.R., 45 F.3d 348, 350 (9th Cir.1995). Thus, the Tax Court's conclusions of law must be examined de novo, see id., including any jurisdictional determinations. See Correia v. C.I.R., 58 F.3d 468, 469 (9th Cir.1995). The same applies to the Tax Court's construction of the Internal Revenue Code. See Citrus Valley Estates, Inc. v. C.I.R., 49 F.3d 1410, 1413 (9th Cir.1995). The Tax Court's factual findings, however, are reviewed for clear error, see id. at 1415, while any of its discretionary rulings will be examined for an abuse of that discretion. See Kelley, 45 F.3d at 350.
 
 Discussion
 I. Limitations Period
 
 11
 Condor first argues that the IRS's September 8, 1987 notice of deficiency was untimely because it was issued more than three years after August 14, 1984, i.e., the date Condor filed its tax return with the BIR for the taxable year ending May 31, 1984. We reject this contention.
 
 
 12
 The TRA's effective date provision, set out in a note to 26 U.S.C. § 931, states that the USVI's inhabitant rule was abolished as of October 22, 1986, for "any pre-1987 open year." TRA § 1277(c)(2)(A)(ii). The TRA defines a "pre-1987 open year" as "any taxable year beginning before January 1, 1987, if on the date of the enactment of this Act [i.e., Oct. 22, 1986] the assessment of a deficiency of income tax for such taxable year is not barred by any law or rule of law." TRA § 1277(c)(2)(C). The question before us, then, is whether Condor was subject to assessment of a deficiency of income tax on October 22, 1986--not September 8, 1987, or any other date after August 14, 1987--for the taxable year ending May 31, 1984.
 
 
 13
 Absent the filing of a false return or a willful attempt to evade the payment of tax, the IRS has three years from the date of the filing of an otherwise proper return in which to assess a tax and/or any deficiencies thereon. 26 U.S.C. § 6501(a).[4] When Condor filed its otherwise proper return with the BIR on August 14, 1984, it did so under the law as it then stood; i.e., Condor was not obligated to file a return with the IRS. See Danbury, Inc. v. Olive, 820 F.2d 618, 626-27 (3d Cir.) (cited with approval in Condor Int'l, 98 T.C. at 216-17), cert. denied, 484 U.S. 964, 108 S.Ct. 453, 98 L.Ed.2d 393 (1987). When the TRA was enacted some two years later, however, the effect of section 1277 was to make Condor retroactively obligated to file a return with the IRS for the tax year ending May 31, 1984, because (a) that tax year began prior to January 1, 1987, and (b) Condor had filed its return therefor within three years of October 22, 1986. See Condor Int'l, 98 T.C. at 217 (citing Business Ventures Int'l v. Olive, 893 F.2d 641, 644 (3d Cir.1990); Bizcap v. Olive, 892 F.2d 1163, 1166-67 (3d Cir.1989), cert. denied, 496 U.S. 905, 110 S.Ct. 2587, 110 L.Ed.2d 268 (1990); and Danbury, Inc. v. Olive, 820 F.2d at 625-26). This Condor failed to do.[5] Accordingly, the deficiency notice was timely. See 26 U.S.C. § 6501(c)(3).[6]
 
 II. Condor's Gain Taxable to the Welshes
 
 14
 The Welshes challenge the Tax Court's ruling that the sale of the Arlon stock to Keene should be attributed to them rather than to Condor. We reject this contention as well.
 
 
 15
 Beginning with the premise that "[t]he incidence of taxation depends upon the substance of a transaction[,]" 98 T.C. at 220, the Tax Court interpreted the largely undisputed facts of the instant appeals in the light of such leading cases as Commissioner v. Court Holding Co., 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981 (1945), to reach the conclusion that "the Welshes attempted to transform their sale of the Arlon stock into a sale by Condor, using Condor as a conduit through which to pass the title of the stock [to Keene]." 98 T.C. at 222. The materials before us show, inter alia, that it was the Welshes who had effective control of the Arlon stock until the time of its sale, and that the Welshes signed the stock purchase agreement individually, not on behalf of Condor. Accordingly, we conclude that the Tax Court did not err by attributing ownership of the stock to the Welshes and holding them liable for the capital gains taxes due from the sale of their Arlon stock.
 
 III. Additions to Tax
 
 16
 The final issue raised by Condor and the Welshes is actually a series of questions concerning the propriety of the various additions to tax imposed by the IRS. For the reasons that follow, we set aside these various assessments.
 
 
 17
 Condor first argues, and the government concedes, that the Tax Court's decision to impose an $18,013.15 penalty against the company under 26 U.S.C. § 6655 is inconsistent with the court's determination that Condor should not be held liable for any addition to tax under that section. See 98 T.C. at 227. As there is no dispute that the Tax Court erred on this point, we reverse the imposition of the $18,013.15 penalty under this section.
 
 
 18
 The IRS also imposed additions to tax against both Condor and the Welshes under 26 U.S.C. § 6651(a)(1)[7] (failure to file a return on or before its due date); former section 6653(a)(1) & (2)[8] (negligent or intentional disregard of rules or regulations); and former section 6661(a)[9] (substantial understatement of tax due). The IRS argued, and the Tax Court found, that neither Condor nor the Welshes had shown that their respective failures to file timely and/or proper returns with the IRS were not the result of willful neglect or were due to reasonable cause. See United States v. Boyle, 469 U.S. 241, 245, 105 S.Ct. 687, 689-90, 83 L.Ed.2d 622 (1985) (discussing section 6651(a)(1)).
 
 
 19
 At all relevant times--i.e., Condor's creation in 1981, the stock transfer in 1983, and the filing of the parties' returns in 1984--there was no controlling authority that would have prohibited the creation of a USVI inhabitant corporation to serve as a holding company for stock, or required that corporation to file an income tax return with the IRS in addition to its return filed with the BIR. Indeed, nearly a year after the TRA had been enacted, and months before the IRS issued deficiency notices to Condor and the Welshes, the Third Circuit expressly held that the TRA did not require a USVI inhabitant corporation chartered in Nevada to file returns with both the IRS and the BIR for tax years 1981 and 1982, even though both of those years were pre-October 22, 1986 tax years. See Danbury, Inc. v. Olive, 820 F.2d at 627 (returns filed with BIR more than three years prior to October 22, 1986, were outside normal three-year assessment period of section 6501(c)(3) and, therefore, were not "pre-1987 open years" for purposes of TRA).
 
 
 20
 Boiled to its essence, then, the underlying assumption to each of these penalties is that Condor and the Welshes should be punished, not so much for having created an offshore vehicle for deferring taxes that would otherwise have been due and payable upon the transfer of their Arlon stock, but for having failed to anticipate that Congress would eventually amend the Tax Code to eliminate those advantages enjoyed by the inhabitants of the USVI. As counsel for the government conceded at oral argument, Condor and the Welshes were entitled to a reasonable period of time after the enactment of the TRA in which to file returns with the IRS. We decline to hold that the amount of time between the passage of the TRA and the IRS's issuance of the deficiency notices to Condor and the Welshes was so far beyond "reasonable" that the parties should be answerable for the penalties imposed. Accordingly, we set aside the assessed deficiencies.
 
 CONCLUSION
 
 21
 The decision of the Tax Court is AFFIRMED with respect to the imposition of capital gains taxes to the Welshes, and REVERSED as to the assessed penalties. Each party will bear its own costs on appeal.
 
 
 
 [1]
 The remaining shares were held by four other individuals who are not parties to these appeals
 
 
 [2]
 Condor is now known as Applied Resources, Inc. For the sake of convenience it will be referred to in this opinion as "Condor."
 
 
 [3]
 Rowe also served as Condor's president and treasurer, and her brother was the company's secretary. Rowe resigned in February 1982, but the Welshes reelected and reinstated her in June 1983, when Condor was being readied for sale. She continued to serve as Condor's sole director, president and treasurer until March 1987, when the Welshes had her removed
 
 
 [4]
 "[T]he amount of any tax imposed by this title shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed)...." 26 U.S.C. § 6501(a) (in relevant part)
 
 
 [5]
 But see discussion in Part III, infra
 
 
 [6]
 "In the case of failure to file a return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time." 26 U.S.C. § 6501(c)(3)
 
 
 [7]
 In case of failure ... to file any return ... on the date prescribed therefor ... unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate[.]
 26 U.S.C. § 6651(a)(1) (in relevant part).
 
 
 [8]
 "If any part of any underpayment ... of tax required to be shown on a return is due to negligence (or disregard of rules or regulations), there shall be added to the tax an amount equal to 5 percent of the underpayment." Former 26 U.S.C. § 6653(a)(1) (in relevant part)
 "There shall not be taken into account ... any portion of an underpayment attributable to fraud with respect to which a penalty is imposed under subsection (b) [imposing a 75% penalty for fraud]." Former section 6653(a)(2) (in relevant part).
 In 1989, Congress amended 26 U.S.C. § 6653 by substituting provisions relating to the failure to pay stamp taxes for those relating to additions to tax for negligence and fraud. See Pub.L. No. 101-239, Title VII, § 7721(c)(1), 103 Stat. 2399 (Dec. 19, 1989) (now codified as 26 U.S.C. § 6653).
 
 
 [9]
 "If there is a substantial understatement of income tax for any taxable year, there shall be added to the tax an amount equal to 25 percent of the amount of any underpayment attributable to such understatement." Former 26 U.S.C. § 6661(a). In 1989 Congress repealed section 6661. See Pub.L. No. 101-239, Title VII, § 7721(c)(2), 103 Stat. 2399 (Dec. 19, 1989)